H. J. SPURWAY, Appellant, v. SHENANDOAH MILLING COMPANY et al., Appellees.
No. 39433.

APRIL 2, 1929.

*Ferguson & Ferguson*, for appellant.

*Keenan, Barnes & Clovis*, for appellee.

Evans, J.—Defendants T. H. Read and Elbert A. Read are father and son, the former being far advanced in years. For more than 25 years, and up to the date of its closing, on May 13, 1926, T. H. Read was president, and Elbert A. Read vice president and active manager, of the First National Bank of Shenandoah. The Shenandoah Milling Company represented a milling enterprise, which was operated at all times by George M. Replogle. George M. Replogle came to the town of Shenandoah in 1898 or 1899. He immediately bought certain real estate in his own name, and built thereon the plant which he ever after occupied. He operated under the name of Shenandoah Milling Company. He transacted his banking business with the First National Bank of Shenandoah. Trullinger and Jones were his employees during nearly the whole period of his operation of the plant; the former being his miller, and the latter being his bookkeeper. It is undisputed that, at the beginning of this enterprise, no one had any financial interest in it other than Replogle. In 1905, he organized a corporation, under the name Shenandoah Milling Company, which corporation took over

Replogle's plant. Replogle owned all the stock in this corporation save one share credited to Trullinger, and one share to his son, C. M. Replogle. The corporation operated as such until the year 1915, when it was voluntarily dissolved, and Replogle again resumed the ownership of the property. Trullinger at all times disclaimed all interest therein after the dissolution, though he continued his employment with Replogle. What relation the son, C. M. Replogle, sustained to the business thereafter, does not appear in the record. Nothing is claimed as against him, and he was not a witness at the trial. During the existence of the corporation, and in 1911, it sustained heavy losses, amounting to $14,000, and the amount thereof was borrowed by the corporation from the First National Bank. From that time to the date of its dissolution, the corporation was owing the First National Bank the full legal limit of $20,000. That indebtedness has been represented ever since by successive renewal notes, of which the notes in suit are the last.

About 1920 or 1921, the troubles of the First National Bank of Shenandoah began to be pressing, and they so continued until the closing of its doors, in May, 1926. One of these troubles was this non-liquid asset. This had come under the sharp surveillance of the bank examiner. In 1918 or 1919, Replogle executed a deed of the property either to the bank or to Elbert A. Read, as security for the debt. The value of the property was about $15,000. The only chance for collecting the debt was to sell the business as a going concern or to close the business and sell the property. In the continuation of the business by Replogle, the bank was confronted frequently with resulting overdrafts, which were not permissible. Such overdrafts appear to have been temporarily cared for by charging the same to the personal accounts of T. H. Read and Elbert A. Read, and sometimes to other accounts. For many of these, reimbursements were later made out of current deposits. The foregoing is a rough picture of the inside affairs of the Shenandoah Milling Company and the First National Bank of Shenandoah, and of the relations between them.

As a ground of liability against the defendants Read, the plaintiff alleged in his petition as follows:

"That the Shenandoah Milling Company is a copartnership composed of the defendants Thomas H. Read, Elbert A. Read,

and George M. Replogle, as copartners, operating under the style and name of the Shenandoah Milling Company, in Shenandoah, Page County, Iowa, and that said Shenandoah Milling Company has been such a copartnership at all times mentioned in this petition, and that the said George M. Replogle was the manager thereof."

Defendant Elbert A. Read's denial of the foregoing allegation presents the fighting issue in the case.

The defendant's motion for a new trial contained many grounds. The motion was sustained generally. The appellant has been under the necessary burden here of rearguing the entire motion for a new trial. More particular attention, however, has been directed by both sides to one particular instruction and to the sufficiency of the evidence to sustain the verdict. It seems to be assumed that the district court attached greater weight to these grounds than to the others. To these grounds we have given our special attention, and are constrained to say that the order of the district court must be sustained as a matter of right, and not as merely one of discretion.

It will be noted that the case presented involves no question of ostensible or apparent partnership, whereby third parties have been induced to believe it to be such and have dealt with it as such. The allegation of the petition is that the three individuals named did in fact constitute such copartnership. From the very nature of the case, an allegation of apparent partnership would not lie. Replogle dealt directly with the First National Bank, through its officers T. H. Read and Elbert A. Read. If they were not partners in fact, they necessarily knew it. There could, therefore, be no misleading of the bank by an appearance of partnership. The plaintiff, as receiver, stands in no other position than that of the bank itself. If these defendants were in fact partners, then the bank could avail itself of that fact, even as against its own officers. But upon this record, the bank could not say that it believed them to be partners, if in fact they were not. The burden was, therefore, upon the plaintiff to prove the partnership and the membership thereof. The case of T. H. Read is adjudicated, and we need give it no attention. Does the evidence support a finding that Elbert A. Read was a member of a copartnership firm under the name of Shenandoah Milling Company? Replogle testified that Read was

not his partner, and that he never had a partner in the business; that the only relation Read sustained to him was that of creditor, or representative of the creditor bank, to whom he conveyed the property, as security for the debt. Trullinger testified that, in all his connection with the business, he never heard of any partnership connection. Jones testified to the same effect. Likewise the defendant Read. As against this very positive direct evidence from the parties in interest, the plaintiff relies upon circumstantial evidence. The question naturally arises: If a partner, *when* did Read become a partner? That question is not covered by allegation in the petition, further than the allegation that he was a partner on November 1, 1925. All the circumstantial evidence is directed to the last five or six years of the life of the bank, and more particularly to the last three or four years. None of the circumstances relied on antedated the year 1920. If the name ''Shenandoah Milling Company'' must be treated as covering a partnership prior to 1920, there is no attempt at proof that Read was a partner at such earlier date. He was not a partner prior to the incorporation. He had no interest in the incorporation, except as an officer of the creditor-bank. If he became a partner in 1920, a new firm would be thereby created. Such new firm would not, as a matter of law, be liable for the debts of the old, except by express assumption. If Replogle had no partner prior to 1920, though he operated under a trade name, and if he formed a partnership in 1920 with Read, surely such partnership would not be liable as a matter of law for Replogle's existing debts. The plaintiff is therefore confronted with something more than the necessity of showing the present conduct and statements of Read on and after the year 1920, in order to charge him with liability for the debts of Replogle or for the debts of a prior existing firm.

This point, however, we pass, and we turn to a consideration of the sufficiency of the evidence contained in this record to show that Read was the partner of Replogle in the period between 1920 and 1926.

The first circumstance in point of time is found in the testimony of Landers, who recited a conversation had with Read in 1920. Landers was formerly associated in business transactions with Read, and their relations were then intimate. Read, being confronted with an overdraft by the Shenandoah Milling Com-

pany, charged the amount of it to the account of Landers. Read's explanation of his conduct is recited by the witness Landers as follows:

"I said to Elbert A. Read: 'Here's a check signed by the Shenandoah Milling Company, charged into my account, for $1,119.75. What does it mean, Elbert?' Elbert said to me, 'Ed, we own the Milling Company,' and there was no money in their account, and in substance he said the mill got so far behind that they had to take the Milling Company over, to pay themselves, 'and if you will hold that check a few days, I will take it up.' "

Also:

"I received a letter from E. A. Read. * * * The substance of the letter was for me to try and get a trade for the Milling Company. I cannot say definitely if he said who owned it."

The witness Sheets testified to certain circumstances as follows:

"In the fall of 1925 and spring of 1926, I had some duties regarding the handling of overdrafts, large loan lines, and reducing them. I was doing this at the instance of the national bank examiner and the Reads, Thomas H. Read, Elbert Read, and Henry Read. I was acting as a director during that period. I was to try to get rid of the excess overdrafts that we had in the bank, and to see that no renewals or excess loans were made. The Shenandoah Milling Company's line of credit was considered by me and the Reads, in that work. * * * There was an overdraft of some $1,100 or $1,200. With regard to reducing this line, I first went down and seen Mr. Replogle. There I went into the office of the Shenandoah Milling Company. After I talked with Mr. Replogle, I had a talk with Elbert Read, in December, 1925, about this overdraft in the First National Bank of Shenandoah. I told Elbert that something would have to be done regarding the overdraft of the Shenandoah Milling Company, and he said he was afraid to do anything with the mill at that time,—he was afraid to close the mill,—because it would reflect upon the Reads; and I then instructed the assistant cashier to cash no more checks of the Shenandoah Milling Company. I had three or four further conversations with Elbert regarding the overdraft. I told him we would have to reduce the over-

draft; it was getting larger every day. He said he would try to take care of it. I had another conversation, probably ten days afterward, in the First National Bank of Shenandoah. Elbert told me he would charge out $1,000 of the Shenandoah Milling Company's account into his own account. I had a further conversation with Elbert. I told him the account had got almost as large an overdraft again as it was before. Elbert said, 'Well, grain is down.' "

Lucille Tyner was a witness. She had worked clerically for a few months, in 1923, for the Shenandoah Milling Company. She testified that Elbert A. Read came into the office, and:

"He asked for the weights, and started to take the weights, and I questioned whether he should have them or not; and he said, 'I don't know why I should not have them,—this place is mine, and I am paying for this grain;' so Uncle George came in behind, and nodded his head. That is all that was said there then, and I considered I had nothing more to say about it."

W. J. Staples, the assessor, was a witness. He testified that in 1923 he assessed the real estate of the Shenandoah Milling Company, and that:

"I obtained the information to fill out that assessment roll from Mr. Elbert A. Read. * * * Mr. Read gave me the description of the property, and told me it was too high."

Richard T. Colwell, who occupied a home adjoining the mill property, testified concerning a conversation with defendant Read, as follows:

"A. Never had any talk with him, only that time when he made me move that house, and he says, 'You are on the mill property;' and I told him I guessed I wasn't on the mill property; and I had a talk with him the other night, too. So he says, 'You will have to move that off; that is on the mill property, and I cannot stand that, you know; I want to get this all surveyed off.' And I says: 'All right with me; have it surveyed off. I will move my house as soon as I can get it out of the way.' And so he says, 'Yes, we want to get this street through here, so we will know where we are at; we want this for a driveway.' I says, 'That is all right.' That is the only answer I gave him; so I done that.

"Q. What did he say, if anything, as to who owned the mill, in that conversation? A. He said 'we.' I don't know who he meant by that."

The foregoing is fairly illustrative of the character of the circumstances and conversations relied on by the plaintiff to prove that Read was the partner of Replogle. Can it be said that such circumstances as these are inconsistent with any other reasonable hypothesis than that of a partnership? When it is considered that Read, as a representative of the bank, was a creditor of the Shenandoah Milling Company; that he held all its property as security; that the property was worth less than the debt; that, in order to sustain the value of the property, it might be desirable to keep it as a going concern; that the shutting down of such property might result in further depreciation of security,—what is there in the conduct and conversation testified to that is inconsistent with a creditor's relation to the property? It appears that, in the latter years of the bank's operation, the Milling Company was operated at a loss. Such loss necessarily resulted in loss to the bank, as its creditor. The indebtedness was in fact substantially larger than the legal limit of $20,000. The bank charged off, at one time, more than $6,000 to profit and loss. Because of this situation, the bank officials conceived the idea that the bank was entitled to include these losses in its income tax report. The losses of the Milling Company were thus included in the bank's income tax report as losses of the bank. Trouble with the revenue collector resulted. This circumstance is relied on by appellant as a major one, and as tending to support the allegation of partnership. If the relevancy of the evidence be granted, as tending to show that the bank considered itself as operating the Milling Company property during the period thus covered in its tax report, yet such evidence has no tendency to prove that Read was the partner of Replogle. On the contrary, it tends to prove the very reverse. It could be said that it tended to show that the bank had taken over the property absolutely under its deed, and that it would be liable for the expenses incurred during the period of such operation. But this fact had no tendency to show that either the bank or its officials became the partners of Replogle. Surely, a creditor who takes property from his debtor, as security for a debt, does not thereby become a partner with his

debtor; much less does he become such in relation to the debt thereby secured. Disregarding the fact that Read sustained the relation of creditor to Replogle, suppose that he had been a volunteer purchaser of the entire property, including good will, and had thereafter continued to operate the property under the same name. He would not thereby become the partner of Replogle. Nor would he become liable for the pre-existing debts of Replogle, if he did become his partner. The utmost that can be said for the evidence in this record is that it tended to prove that, between 1920 and 1925, Read, as an officer of the bank, assumed dominion over the milling property, and dominated the operation thereof. Whether it was sufficient proof of such fact, we need not determine. It is sufficient to say that such evidence does not support the allegation of the petition that Read was the partner of Replogle or of anyone else under the name of Shenandoah Milling Company.

In view of our conclusion at this point, we have no occasion to consider other features of the record. The order of the district court setting aside the verdict is—*Affirmed.*

ALBERT, C. J., and FAVILLE, KINDIG, and GRIMM, JJ., concur.